**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**
_____

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                     Case No. 21-20395

ROBERT CORTEZ BURRELL,

        Defendant.
_____/

### OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Defendant Robert Cortez Burrell moves to suppress evidence stemming from the execution of search warrants at four different homes located in Wayne County, Michigan. (ECF No. 18.) Defendant contends that the searches of the homes violated his Fourth Amendment rights because although law enforcement obtained a warrant for each of the homes, there was insufficient probable cause to support issuance of the warrants. He maintains that the affidavits in support of a warrant "unreasonably relied upon an anonymous informant" and that the "warrant applications did not provide particularized information to believe that each of the homes would contain evidence of a crime." (*Id.*, PageID.54.) Moreover, he argues that the good faith exception to the exclusionary rule does not apply because the warrant was so lacking in probable cause that any reliance on it would be unreasonable. (*Id.*) Defendant asks the court to determine that the physical evidence seized—as well as statements he made to law enforcement as a result of the searches—are fruits of an illegal search and inadmissible at trial.

The government filed a response (ECF No. 19), and Defendant replied. (ECF No. 20.) The court has reviewed the parties' briefs and finds a hearing unnecessary. E.D. Mich. LR 7.1(f)(2). For the reasons set forth below, the court determines there was ample probable cause to support the issuance of the search warrants, and Defendant's motion will be denied.

## I. BACKGROUND

In late September 2020, an anonymous source of information ("SOI") approached the Drug Enforcement Agency ("DEA") and "identified [Defendant] as a narcotics trafficker, operating out of several locations" located in Wayne County, Michigan. (ECF No. 18, PageID.58; ECF No. 18-2, PageID.77.) The SOI informed the DEA that Defendant utilized at least two specific properties—one on College Avenue in Lincoln Park and another on Arlington Avenue in Allen Park—to "store narcotics and or proceeds derived from the sale of illegal narcotics." (ECF No. 18-2, PageID.77.) Finally, the SOI advised the DEA that Defendant "will make frequent narcotics deliveries from Michigan to Ohio," during which he would use "rental vehicles and or vehicles not directly tied to him to limit detection and identification from law enforcement." (*Id.*)

From there, a three-month investigation ensued. (See ECF No. 18-2, PageID.77-90.) The investigation consisted of, *inter alia*, numerous instances of surveilling Defendant and the relevant properties, GPS monitoring of Defendant's vehicle, and an interview with a purchaser of heroin. (*Id.*) Law enforcement witnessed a wide variety of suspicious conduct, much of which reinforced the information given to investigators by the SOI—including, for example, Defendant travelling to Ohio to engage in suspected drug deals. (*Id.*, PageID.79-81, 86-87.) Investigators also observed Defendant engaging

in suspected "heat runs," described as a countersurveillance measure utilized to detect law enforcement surveillance operations.[1] (*Id.*, PageID.88-89.) According to the affidavits, the bulk of the investigation occurred during October and December 2020 and consisted of surveillance of the College and Arlington properties; however, much of their investigation led them to additional information pertaining to a home being used to store, package, and distribute drugs on Fairmont Street in River Rouge, Michigan. (ECF No. 18-2, PageID.82-86, 85-86.) The Fairmont property also was associated with another alleged drug trafficker. (*Id.*) Law enforcement's efforts, which are detailed in the affidavits at issue, ultimately led to the issuance of search warrants for the College, Arlington, and Fairmont properties.[2]

In December 2020, a DEA task force executed the warrants. (ECF No. 18-5, PageID.149.) Investigators recovered approximately $15,000.00 in cash, 800 grams of fentanyl, a kilogram of heroin, and three handguns. (*Id.*) Defendant was present during the search of the Arlington home; officers placed him under arrest and transported him to DEA Detroit for further investigation. (*Id.*)

During a post-*Miranda* interview, investigators learned that Defendant "often resides at 822 Farnham Avenue, Lincoln Park, Michigan" and receives mail at that

---

[1] According to the affidavits, during a heat run, it is "common for narcotics traffickers to travel to locations using the most indirect routes and travel at speeds less than the posted speed limits in an attempt to locate surveillance vehicles," as well as to "enter parking lots, circle the lot, and depart the lot in attempts to identify surveillance vehicle[s] following them." (ECF No. 18-2, PageID.88.)

[2] The affidavits in support of these three properties are identical and outline the complete investigation of Defendant and all of the properties. The Farnham affidavit is also identical but includes additional information regarding Defendant's arrest and statements he made about his use of the Farnham home.

location. (*Id.*, PageID.150.) Through the course of his arrest and booking, he referred to the Farnham home as his residence, although he noted that it was owned by his mother. (*Id.*) Investigators recalled that, over the course of the investigation, Defendant was observed at the Farnham property on at least five occasions in a short period of time. (*Id.*) Moreover, he "expressed concern" over the Farnham home and "asked if agents/officers executed a search warrant at that residence." (*Id.*) Finally, the affiant noted how narcotics traffickers frequently use "residences belonging to family members" to limit detection from law enforcement and to more discreetly package, hide, or store narcotics and proceeds from illicit sales. (*Id.*, PageID.151.) According to the government, the search of the Farnham home yielded "approximately 83 grams of cocaine, a kilo press, and ammunition." (ECF No. 19, PageID.164.)

A grand jury subsequently charged Defendant with two counts of possession with intent to distribute a controlled substance, 21 U.S.C. § 841(a)(1), and one count of felon in possession of a firearm, 18 U.S.C. § 922(g)(1). (ECF No. 1.) The government notes that the charges concern evidence seized from the College property. (ECF No. 19, PageID.164.) Defendant's chief complaint is that law enforcement, with "no further information" about the SOI such as criminal history, the basis for its knowledge, or its motivations, requested and received the search warrants at issue. (ECF No. 18, PageID.54, 58.) He also contends there was insufficient particularized information in the affidavits to establish that "each of the homes would contain evidence of a crime." (*Id.*, PageID.54.)

## II. STANDARD

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The purpose of the Fourth Amendment is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) (quoting *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 528 (1967)). "[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)).

The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Herring v. United States*, 555 U.S. 135, 139 (2009) (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). Over the course of many years, the Supreme Court developed the "exclusionary rule," which "forbids the use of improperly obtained evidence at trial." *Id.* The rule is "designed to safeguard Fourth Amendment rights generally through its deterrent effect" and is not a "necessary consequence of a Fourth Amendment violation." *Id.* at 139-40, 141 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)); *Davis v. United States*, 564 U.S. 229, 236-37 (2011) (citations omitted) ("Exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search. The rule's sole purpose . . . is to deter future Fourth Amendment violations.").

The exclusionary rule serves to "prohibit[] introduction into evidence materials seized during an unlawful search, and of testimony concerning knowledge acquired

during an unlawful search." *United States v. Howard*, 621 F.3d 433, 451 (6th Cir. 2010) (quoting *Murray v. United States*, 487 U.S. 533, 536-37 (1988)). It also prohibits "the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." *Id.*

### III. DISCUSSION

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "Designed to prohibit the general warrants common at the time of the founding, this text requires that a warrant specifically identify the 'place' to be searched and the 'things' to be seized." *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 289 (2021). The Fourth Amendment further requires that "probable cause be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1947)). Defendant argues the magistrate judge improperly issued the warrants authorizing searches of the four properties at issue because there was no probable cause. (ECF No. 18.)

### A. Probable Cause

An affidavit in support of a warrant application "must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the

issuance of the warrant." *Id.* (citing *Whiteley v. Warden*, 401 U.S. 560, 564 (1971)). "The affidavit must establish a nexus between the place to be searched and things to be seized, such that there is a substantial basis to believe that the things to be seized will be found in the place searched." *Ellison v. Balinski*, 625 F.3d 953, 958 (6th Cir. 2010). An affidavit must contain "particularized facts" for the magistrate to properly make this determination. *Weaver*, 99 F.3d at 1378.

In a magistrate's determination of whether an affidavit establishes probable cause to justify the issuance of a search warrant, the central task is to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 214, 238 (1983). While a magistrate may consider an officer's "training and experience" as a factor in establishing probable cause, it cannot, standing on its own, "substitute for the lack of [an] evidentiary nexus" between the place to be searched and criminal activity. *United States v. Schultz*, 14 F.3d 1093, 1097 (6th Cir. 1994); *United States v. Gholston*, 993 F. Supp. 2d 704, 717 (E.D. Mich. 2014). "'A magistrate's determination of probable cause is afforded great deference by the reviewing court' and such a finding should be reversed only if the search warrant was authorized 'arbitrarily.'" *Gholston*, 993 F. Supp. 2d at 717 (quoting *United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001)).

### 1. The SOI's Tips Were Corroborated

Defendant argues that there was no probable cause because the magistrate improperly "credited law enforcement's reliance on a totally anonymous, new source of information" and the affidavits otherwise lacked "minimum facts about the informant and

their basis of knowledge." (ECF No. 18, PageID.60, 63.) But because Defendant mischaracterizes the breadth of the affidavits and ignores crucial facts regarding the investigation, his arguments fall short.

Defendant points out that the Sixth Circuit has held "where a known person, named to the magistrate, to whose reliability an officer attests with some detail, states that he has seen a particular crime and particular evidence, in the recent past, a neutral and detached magistrate *may* believe that evidence of a crime will be found." *United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000). And it is true that an informant's tip "is considered to have greater reliability, and therefore to be more supportive of a finding of probable cause, if the affidavit avers that the name of the confidential informant has been disclosed to the issuing judge." *United States v. May*, 399 F.3d 817, 823 (6th Cir. 2005) (citing *United States v. Helton*, 314 F.3d 812, 820 (6th Cir. 2003)). However, the "failure to identify the informant to the issuing magistrate is not the failure of a 'minimal requirement,' nor does it make the search warrant presumptively void. Rather, it is but one 'relevant consideration[] in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations." *Id.* (alteration in original) (quoting *Gates*, 462 U.S. at 233). Indeed, in cases of an unidentified informant, a warrant will be deemed to be supported by probable cause if the government establishes that the magistrate had before him additional evidence that "buttressed the informant's information." *See id.* (quoting *United States v. Williams*, 224 F.3d 530, 532-33 (6th Cir. 2000)); *Williams*, 224 F.3d at 533 (finding that although the "informant . . . was not identified," probable cause existed because "the additional information about the police surveillance . . .  corroborates the informer's information"). In such cases, law

enforcement must take steps to test the informant's veracity," such as "verify[ing] key information received from the informant, where plausible to do so," or perhaps "identify[ing] multiple sources providing the same information, increasing the likelihood that the tip is reliable." *United States v. Crawford*, 943 F.3d 297, 307 (6th Cir. 2019); *cf. United States v. Elkins*, 300 F.3d 638, 659-60 (6th Cir. 2002) ("[T]hough we deal with an anonymous informant's tip, we similarly hold that the three officers' detection of the marijuana smell inside the house corroborated the tip [that the defendant was growing marijuana] enough to establish probable cause for a warrant.").

The case before the court is not one in which law enforcement sought and obtained a search warrant based only on an unidentified informant's belief that Defendant was engaging in criminal activity. *See, e.g.*, *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005) (finding no probable cause where there were "no averments about the reliability of the information provided by the anonymous informants in the past" nor "evidence that [investigators] corroborated the information that the informants provided"). Rather, it is clear that the investigators, utilizing their training and experience, made extensive efforts to corroborate the SOI's tip and conducted a thorough investigation to establish probable cause. While the affidavit states only that the SOI has, since providing the initial tip, "been deemed creditable/reliable" and that the SOI's assistance "has led to the seizure of quantities of heroin/fentanyl" (ECF No. 18-2, PageID.77), the affidavit also details the affiant's experience and the steps taken to investigate Defendant.

As an initial matter, the affiant has nine years of experience in law enforcement with a particular focus on investigating drug crimes; before working on the DEA task

force, he was assigned to a multi-jurisdiction task force as part of the Southeastern Criminal Intelligence Division of the Michigan State Police. (*Id.*, PageID.75.) He has also been trained in advanced narcotics investigations and drug identification. (*Id.*) The affiant discussed in detail, based on his participation in "numerous" controlled substance investigations, common behaviors exhibited by drug traffickers—including, but not limited to, where or how traffickers conceal drugs or proceeds, as well as the manner in which a narcotics transaction is conducted by a suspect. (*Id.*, PageID.75-76, 83-84.) Officers observed Defendant engage in behavior consistent with narcotics trafficking.

Shortly after receiving the tip from the SOI, law enforcement ran a background check on Defendant and discovered, *inter alia*, two previous convictions for "Felony Dangerous Drugs." (*Id.*) On October 15, 2020, the investigators began their surveillance of the College property, which was specifically identified by the SOI as being used for narcotics trafficking by Defendant. (*Id.*, PageID.77-78.) Consistent with the information provided by the SOI, Defendant exited the house and entered a vehicle with a license plate not registered to him. (*Id.*) The affiant noted that it is "common for drug traffickers to utilize[] rental vehicles to assist in masking their identification and limit law enforcement detection." (*Id.*, PageID.78.) Surveillance continued the next day, and law enforcement observed Defendant use this rental vehicle to drive to Oregon, Ohio. (*Id.*, PageID.79.) Again, this was consistent with the SOI's tip that Defendant "will make frequent narcotics deliveries from Michigan to Ohio" using rental vehicles. (*Id.*, PageID.77.) Defendant drove to an Ohio residence, where an individual emerged from the home, approached the passenger side of Defendant's vehicle, and then returned back into the home—as noted by the affiant, "short-term stops/interactions are common

amongst drug traffickers and often conducted when engaging in a narcotics transaction." (*Id.*, PageID.79.)

Less than twenty minutes later, surveillance observed Defendant travel to a parking lot, open the driver's side door of an unoccupied vehicle, close the door, and return to his vehicle. (*Id.*, PageID.80.) Investigators continued surveillance of the vehicle, and eventually, a woman entered the vehicle and drove away; after a traffic violation, she was pulled over by the Ohio State Police. (*Id.*) A K-9 unit detected narcotics in her car. (*Id.*) Upon finding two plastic bags with a substance that appeared to be heroin, she was arrested. (*Id.*) During a post-*Miranda* interview, she admitted to purchasing heroin from "a narcotics trafficker whom she had known for the past 10 years." (*Id.*) She identified a man with the street name "Black" as her dealer, and her description of Black exactly matched Defendant's. (*Id.*) She further described the methods in which her dealer conducted his drug trafficking business and the process through which she purchased heroin from him. The affiant noted the actions of Black, as described by the arrestee, were "the exact actions previously observed by investigators of [Defendant]." (*Id.*) Thus, at least one independent source corroborated the SOI's tips as to Defendant's narcotics trafficking.

As detailed in nearly ten additional pages of the affidavit, investigators continued their surveillance of Defendant and the properties over the course of the next several weeks.[3] On numerous occasions, investigators observed Defendant, through

---

[3]     The SOI provided the DEA with more tips as the investigation progressed. For example, after law enforcement recovered heroin off of the suspected buyer in Ohio, the SOI informed the DEA that Defendant relocated to the Arlington home as his primary residence "in case law enforcement has located him at College Avenue due [to] the . . . traffic stop and interview" of the buyer. (ECF No. 18-2, PageID.81.) A subpoena

surveillance or GPS tracking, making very frequent and consistent trips to all four properties at issue, often stopping briefly at one of the homes before engaging in another brief interaction with suspected buyers. Defendant also exhibited behavior often attributed to drug traffickers, including engaging in "heat runs" when traveling to and from one of the homes he utilized for trafficking. Moreover, the SOI's tip regarding drug sales in Ohio was again corroborated on December 3, 2020. On those dates, physical and electronic surveillance showed that Defendant traveled from the Arlington property to the College property before embarking on a trip to Sylvania, Ohio; there, he made a brief stop at a gas station and within approximately thirty minutes was returning to Michigan. (*Id.*, PageID.86-87.) Investigators obtained surveillance footage of the gas station the next day, and the video showed Defendant engaging in actions "identical to . . . the actions in which [Defendant] engaged in on October 16, 2020," the day in which law enforcement seized heroin from a suspected buyer in Ohio. (*Id.*, PageID.89-90.) Thus, law enforcement quite clearly "buttressed" the information it received from the SOI through its verification of key aspects of the SOI's tips. *See May*, 399 F.3d at 824; *United States v. Archibald*, 685 F.3d 553, 557 (6th Cir. 2012) (explaining that an explicit, detailed description of alleged wrongdoing and a statement that law enforcement observed the event firsthand entitles an informant's tip to "greater weight than might otherwise be the case").

---

subsequently confirmed that Defendant is the registered customer for DTE Energy at this address, and it is the address listed on his driver's license. (*Id.*) The SOI also indicated that the Fairmont property was being used for "cutting" illegal narcotics and preparing drugs for distribution. (*Id.*, PageID.83.)

## 2. Probable Cause Existed as to Each of the Homes

Defendant also argues that the warrant application lacked a sufficient nexus between the evidence sought and the place to be searched. (ECF No. 18, PageID.63-66.) He maintains that the government relies on only "a pyramid of untenable inferences" rather than a specific relationship between the homes and the suspected criminal activity.[4] (*Id.*, PageID.64 (quoting *United States v. Norwood*, 989 F. Supp. 2d 570, 577 (E.D. Mich. 2013)).)

As previously noted, the question as to probable cause is a common-sense inquiry into whether, "given all the circumstances set forth in the affidavit . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Although, in the case of drug dealers, evidence is often "likely to be found where the dealers live," the Sixth Circuit has made clear that a suspect's "status as a drug dealer, standing alone," does not give rise to "a fair probability that drugs will be found in his home." *United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016) (quoting *Frazier*, 423 F.3d at 533). "[I]f the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence

---

[4]    The court will assume for purposes of this motion, as the government did, that Defendant has standing to contest the searches conducted at all of the homes. (ECF No. 19, PageID.169-70.) However, at least pertaining to the Fairmont property, which was allegedly used only for purposes of conducting a drug trafficking operation and never as a residence, standing appears questionable. *See, e.g.*, *United States v. Trammell*, 52 F. App'x 661, 664 (6th Cir. 2002) (holding that the defendant lacked standing because there was no evidence that he had ever "passed a night" in the apartment at issue, kept clothes there, or "for that matter had done anything on the premises other than pursue his drug-trafficking career"); *United States v. Walsh*, 654 F. App'x 689, 704 (6th Cir. 2016) (citing *Minnesota v. Carter*, 525 U.S. 83, 90 (1998)) (finding no reasonable expectation of privacy in an apartment that defendant never inhabited).

of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." *Id.* at 384. Defendant likens his case to *Brown*, characterizing his as one featuring an affidavit containing "no evidence that [Defendant] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there." *Id.* at 382. But Defendant misses the mark; the Arlington, College, and Fairmont properties were the focal point of the investigation.[5]

The SOI's initial tip specifically identified the Arlington and College properties as locations used by Defendant to "store narcotics and proceeds derived from the sale of illegal narcotics." (ECF No. 18-2, PageID.77.) Investigators surveilled these homes to determine, using their training and experience, whether the homes were in fact used to conduct a drug trafficking business. As the affiant noted, drugs and proceeds are generally stored "where the drug trafficker has dominion and control, where they have ready access and at places where they reside." (*Id.*) Consistent with this theme, Defendant often traveled and entered one of the properties before a suspected drug deal would occur. For example, on November 6, 2020, Defendant departed his Arlington home and travelled to the Fairmont property—which, according to the SOI, was utilized for preparing drugs for distribution.[6] From there, Defendant made a brief, five-minute

---

[5]     Defendant also maintains that the post-*Miranda* statements given to law enforcement following his arrest at the Arlington home are fruits of an illegal search and must be excluded, particularly because without the allegedly deficient search warrants and the resulting seizure of evidence, he never would have made incriminating statements to law enforcement. (ECF No. 18, PageID.55.) But because the searches were not illegal, the court rejects Defendant's argument.

[6]     In fact, this was corroborated by members assigned to Michigan State Police's Narcotics Enforcement Team ("MNET"). MNET learned that the Fairmont residence is

stop at the College property before driving to and parking outside a house in Detroit. (*Id.*, PageID.83.) An individual then approached Defendant's driver's side window, and Defendant drove back to his Arlington home; investigators watched as he exited the vehicle, "obtain[ed] a box from the passenger side of the vehicle, and enter[ed] the residence." (*Id.*, PageID.84.) The affiant noted these actions were consistent with a narcotics transaction. Thus, given the timing of the short detours to each of the Arlington, College, and Fairmont homes—and two independent sources identifying Defendant as a drug trafficker—a common-sense conclusion is that Defendant utilized each of these properties as an integral part of his narcotics trafficking scheme. *See, e.g.*, *United States v. Goward*, 188 F. App'x 355, 358 (6th Cir. 2006) (finding probable cause where there were credible allegations of drug trafficking, verification that a defendant lived at a particular home, and an affiant's averment that drug dealers keep evidence at their residence—despite there being "absolutely no indication of any wrongdoing occurring at that residence"); *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011) ("Commission of a drug transaction outside of a house and one participant's walking back into the house, as observed in this case, plainly demonstrated a sufficient nexus with the house."). Indeed, electronic surveillance revealed, in the course of a week, numerous "long term and frequent stops" by Defendant at the Arlington and College homes, at least five stops at the Fairmont property, and at least four brief stops to a house in Detroit where officers previously observed Defendant

---

"utilized to traffic illegal narcotics" such as heroin and crack cocaine. (ECF No. 18-2, PageID.82-83, 86, 89.) It is also associated with an individual "alleged to [be] a mid-level narcotics trafficker dealing in ounces of narcotics and up to quarter kilograms of narcotics." (*Id.*)

engage in a suspected drug transaction. (*Id.*, PageID.85-86.) *See United States v. Berry*, 565 F.3d 332, 339 (6th Cir. 2009) (citing *Frazier*, 423 F.3d at 533) ("[T]here is support for the proposition that status as a drug dealer plus observation of drug activity near defendant's home is sufficient to establish probable cause to search the home."); *United States v. Miggins*, 302 F.3d 384, 393-94 (6th Cir. 2002) (reversing district court's determination that no probable cause existed because it was reasonable to believe that a drug dealer would store narcotics or equipment used in the distribution of drugs in his home, even where law enforcement did not witness drug trafficking at the specific location).

In short, the affidavits in support of the warrant application established probable cause to believe Defendant not only engaged in drug trafficking, but also that he either resided in or utilized each of the properties to further his drug trafficking operations.[7] *See United States v. Sumlin*, 956 F.3d 879, 887 (6th Cir. 2020) (distinguishing *Brown* and noting that there was no probable cause in *Brown* because the government lacked "evidence showing that defendant had sold drugs in the recent past, that he had a car

---

[7]     Defendant's post-*Miranda* statements were incorporated into the search warrant for the Farnham property and sufficiently established probable cause for the search there as well. (ECF No. 18-5, PageID.150-51.) Defendant admitted that he used the home as a residence, his mother owned it, and he received mail there. (*Id.*) Additionally, the investigation established Defendant as a drug trafficker, and confirmed that Defendant went to the Farnham home at least four times over a ten-day period in December 2020, during which Defendant engaged in suspicious activity. (*Id.*, PageID.150.) Indeed, as noted in the Farnham affidavit, law enforcement at this point had already seized 800 grams of fentanyl, a kilogram of heroin, three handguns, and over $15,000 in cash from the first three homes. (ECF No. 18-5, PageID.149.) Defendant also "expressed concern" over the Farnham home and "asked if agents/officers executed a search warrant at that residence." (*Id.*, PageID.150-51.) Finally, the affiant noted how narcotics traffickers frequently use "residences belonging to family members" to limit detection from law enforcement and to more discreetly package, hide, or store narcotics and proceeds from illicit sales. (*Id.*, PageID.151.)

directly tied to his drug trafficking activities, that such car was parked at his suspected residence, or in fact, that there were any suspicious communications tying his criminal activities to the suspect residence"), *cert. denied*, 141 S. Ct. 605 (2020). Defendant's behavior and law enforcement's investigations demonstrated that he, at a minimum, had dominion or control or ready access to all of the properties, and all of his suspicious behavior either was initiated by or culminated in law enforcement observing him at one of the homes; his habitual use of the properties established that his drug trafficking operation and the four homes were inextricably intertwined. Between the corroborated averments from the SOI regarding the use of the homes, his past drug convictions, identification by two sources as a narcotics dealer, a transaction that led to the seizure of narcotics, the suspicious behavior over the course of three months, and his consistent utilization of the homes, probable cause was established. *See Sumlin*, 956 F.3d at 887 (finding probable cause to search home where affiant knew from experience that dealers routinely keep drug-related items stored in residences, and where there was circumstantial evidence indicating that defendant lived at the particular home). The warrant, therefore, with particularity established a nexus between the place to be searched and things to be seized. There was certainly a "substantial basis to believe that the things to be seized will be found in the place searched." *See Balinski*, 625 F.3d at 958.

## B. Good Faith Exception

The Sixth Circuit has adopted the "good faith exception" to the exclusionary rule. *See United States v. Savoca*, 761 F.2d 292, 294 (6th Cir. 1985) (citing *United States v. Leon*, 468 U.S. 897 (1984)). Because the exclusionary rule "is a judicially created (as

opposed to constitutionally required) remedy for and deterrent to violations of the Fourth Amendment," suppression of evidence is not necessary "where [police conduct] was pursued in complete good faith"—in such circumstances "the deterrence rationale loses much of its force." *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (quoting *Leon*, 468 U.S. at 919). Where officers act "in objectively reasonable reliance on a search warrant that is subsequently invalidated," the exclusionary rule will not bar the government's introduction of evidence. *Id.* (citing *Leon*, 468 U.S. at 918-21).

There are generally four situations where the good faith exception does not apply:

> (1) when the warrant is issued on the basis of an affidavit that the affiant knows (or is reckless in not knowing) contains false information; (2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and, (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid.

*Id.* (citing *Leon*, 468 U.S. at 914-23). Here, Defendant contends that the third situation is applicable, arguing that the affidavit is a bare-bones affidavit which precludes finding that any reliance on it was in good faith.[8] (ECF No. 18, PageID.54 ("The warrant lacked sufficient indicia of probable cause to justify reliance.").)

"The inquiry into whether an affidavit is so bare bones as to preclude application of the good-faith exception is a less demanding inquiry than the one involved in determining whether an affidavit provides a substantial basis for the magistrate's conclusion of probable cause." *United States v. Rose*, 714 F.3d 362, 367 (6th Cir.

---

[8]     Affidavits that are "so lacking in indicia of probable cause" are also known as "bare-bones" affidavits. *Laughton*, 409 F.3d at 748.

18

2013). "[A] court reviewing an officer's good faith under *Leon* may look beyond the four corners of the warrant affidavit to information that was known to the officer and revealed to the issuing magistrate." *Reed*, 993 F.3d at 453 (quoting *United States v. Frazier*, 423 F.3d 526, 535-36 (6th Cir. 2005)).

Assuming, *arguendo*, that the affidavit did not support a finding of probable cause, it is nonetheless clear the officers' reliance on the search warrant was objectively reasonable; the affidavit was far from "bare-bones." "Even if an affidavit describing a suspect's drug activity does not establish a probable-cause nexus between the place to be searched and the evidence of that activity, the affidavit will avoid the bare-bones label so long as it identifies a 'minimally sufficient' nexus between the two." *Id.* at 450 (citing *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004)). A "minimally sufficient nexus" is present where there is "some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched." *Id.* (quoting *United States v. McCoy*, 905 F.3d 409, 418 (6th Cir. 2018)).

Here, there was substantially more than some slight "modicum of evidence" connecting Defendant's criminal activity with his home. Again, this is not a case in which the government searched a home merely on an anonymous, uncorroborated tip, or even a single drug transaction. *See, e.g.*, *Laughton*, 409 F.3d at 751 (declining to apply the good faith exception where officers relied on an affidavit including only "the address of the premises to be searched, a summary of the deputy's professional experience, and two acontextual allegations"); *United States v. Hython*, 443 F.3d 480, 489 (6th Cir. 2006) (rejecting application of good faith exception where a warrant was based on a

single unrelated, undated controlled buy). Rather, all of the tips from the SOI were corroborated. Additionally, an investigation revealed, *inter alia*, Defendant's reputation as a drug trafficker in the community, narcotics seized from an individual who had just interacted with Defendant, Defendant's past drug convictions, his association with a known drug dealer, and his frequent use of the four homes to conduct his illicit business and avoid law enforcement—particularly his trips to or from the homes either before or after a suspected drug transaction. *See Reed*, 993 F.3d at 451 ("[W]hen we have rejected *Leon*'s exception in the past, the police generally lacked reliable proof that the defendant was recently (or ever) engaged in drug dealing."). As the affiant noted, much of the suspicious activities were, in the affiant's training and experience, consistent with drug trafficking. *See id.* ("Here, [a detective's] experience at least provides another reason to trigger *Leon*'s exception."). The court is persuaded that "reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant" was objectively reasonable. *Leon*, 468 U.S. at 922.

In summary, given the comprehensive investigation detailed in the affidavit, it is simply not possible to conclude that the officers "recklessly relied on the judge's decision that probable cause existed for the warrant." *Reed*, 993 F.3d at 450 (citing *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017)). Only when law enforcement operates in "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights will the heavy toll of suppression pay its way." *White*, 874 F.3d at 497 (internal quotations omitted) (citing *Davis v. United States*, 564 U.S. 229, 237-38, (2011)). Thus, *Leon*'s good faith exception applies, and the evidence seized by officers pursuant to the search warrants of the four homes should not be suppressed.

**IV. CONCLUSION**

After a review of the affidavits, the court finds that the warrants authorizing a search of the homes were supported by ample probable cause. There were specific facts alleged in the affidavit that established, with particularity, an evidentiary nexus between the homes and Defendant's drug trafficking business. And even if the affidavits fell short of an objective finding of probable cause, the good faith exception to the exclusionary rule justifies admitting the fruits of the search and any derivative evidence. Accordingly,

IT IS ORDERED that Defendant's "Motion to Suppress" (ECF No. 18) is DENIED.

s/Robert H. Cleland                            /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  May 14, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 14, 2022, by electronic and/or ordinary mail.

s/Lisa Wagner                                 /
Case Manager and Deputy Clerk
(810) 292-6522


S:\Cleland\Cleland\MAZ\Criminal\21-20395.BURRELL.MotionToSuppress.MAZ.docx